## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

ROSS SHAUN ADAIR                                APPEAL CIVIL ACTION
    *Appellant*

VERSUS                                          23-625-SDD-RLB

STUTSMAN CONSTRUCTION, LLC
    *Appellee*

### <u>OPINION</u>

Appellant Ross Shaun Adair ("Adair") appeals the Bankruptcy Court's judgment in favor of Appellee Stutsman Construction, LLC ("Stutsman") in Adversary Proceeding No. 22-1009 in the Middle District of Louisiana. The Bankruptcy Court held a trial that began on June 15, 2023.  The Bankruptcy Court entered its Opinion and Judgment in favor of Stutsman on July 14, 2023.  The Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 158.  For the reasons set forth below, the ruling and order of the Bankruptcy Court is AFFIRMED.

## I.      BACKGROUND AND PROCEDURAL POSTURE

In August 2016, Adair's home flooded,[1] and he contracted with Stutsman to repair his home on September 7, 2016.[2] These repairs were approved by his mortgage company, Freedom Mortgage.[3] Freedom Mortgage issued four checks to pay for the repairs, each of which were issued following an inspection and were payable to both Adair

---

[1] Trial Transcript, Rec. Doc. 3, p. 106, lines 18–24.
[2] Defense Exhibit 10, at ¶ 1.
[3] Exhibit P1, pp. 5–13. These repairs totaled to $169,261.90. *Id.* Stutsman and Adair later contracted for additional work outside of the repairs; this second contract totaled $174,629.31. Exhibit P8.

and Stutsman as "Ross S. Adair Stutsman Construction"; their names were listed without a conjunction such as "and" or "or" in between.[4] For the first three checks, Adair endorsed and gave them to Stutsman.[5] Following an inspection and report marking the work as 100% complete,[6] Freedom Mortgage issued the fourth and final check for $71,755.48 on June 22, 2017.[7] The contract between Adair and Stutsman provided that the final payment was "due upon job completion,"[8] although the parties' course of conduct was that Adair would pay Stutsman "as the checks would come in," and that Stutsman "really didn't perform any work until [it] received payment."[9]

Adair endorsed the final check and deposited it into his own bank account, denying the proceeds from Stutsman.[10] When Stutsman's manager Roy Stutsman ("Roy") asked Adair for the final check, Adair refused, claiming the work was incomplete and defective.[11] Adair alleged multiple problems with the repairs,[12] but his primary complaint was water damage in the master bedroom caused by a pipe leak.[13] Roy was aware of the water damage as well as a chipped drain pan in the master bathroom, but otherwise, he

---

[4] Exhibit P3; Exhibit P4; Exhibit P5; Exhibit P6. *See* Rec. Doc. 2-3, p. 83 (uncontested material fact (d)).

[5] Exhibit P3; Exhibit P4; Exhibit P5.

[6] Rec. Doc. 2-2, p. 192. *See also* Rec. Doc. 2-3, p. 84 (plaintiff's proposed findings of fact (b)); Rec. Doc. 6, p. 11; Trial Transcript, Rec. Doc. 3, p. 99, lines 8–11. Adair claims that the inspector asked him if he wanted the final check to be issued, and Adair agreed. Rec. Doc. 3, p. 99, lines 8–11; Rec. Doc. 3, p. 101, lines 5–6. Adair also claims that the inspector did not do a walk-through of the entire house. *Id.* at p. 101, lines 1–3.

[7] Rec. Doc. 2-2, p. 201.

[8] *Id.* at p. 180, 212.

[9] Trial Transcript, Rec. Doc. 3, p. 111, lines 6–15.

[10] Rec. Doc. 2-3, p. 84 (uncontested material facts (f), (j)).

[11] Exhibit D9; Trial Transcript, Rec. Doc. 3, p. 107, lines 22–24; Rec. Doc. 3, p. 116, lines 2–9.

[12] Adair alleged problems with the master shower, air conditioning unit, flooring, sheetrock, kitchen cabinets, gas lines, and hot water heater. Trial Transcript, Rec. Doc. 3, p. 116, line 4–p. 118, line 7; Rec. Doc. 3, p. 122, line 25–p. 123, line 11.

[13] The bankruptcy court stated that the leak was caused by a preexisting rusted pipe, not by Stutsman. Rec. Doc. 1-1, p. 3. Adair argues that the leak was caused by a "malfunctioning air conditioning system (improperly installed by Stutsman)." Rec. Doc. 6, p. 11. When Adair told Roy about the leak, Roy testified that he tried to contact the A/C company to fix the leak, but the company could not send anyone out until the following day. Rec. Doc. 3, p. 27, lines 2–13.

considered the work "99 to a hundred percent" completed with the exception of small touchups or "punch list" items.[14] Roy offered Adair three options for Stutsman to complete the touchups and fix Adair's problems,[15] but Adair refused all options and kept the money.[16] Adair claims that Freedom Mortgage told him to withhold payment due to the construction issues and that his bank advised him he could endorse the check without Stutsman's signature.[17]

Stutsman sued Adair in the 23rd Judicial District Court for Ascension Parish on August 17, 2017, and on July 31, 2020, the court rendered judgment against Adair for $71,755.48 in addition to judicial interest, reasonable attorney fees, and all additional costs ("Judgment").[18] On May 24, 2022, Adair filed a voluntary Chapter 13 bankruptcy petition,[19] and on September 15, 2022,  pursuant to  11 U.S.C § 523(a)(6), Stutsman filed a Complaint for its Judgment to be excepted from discharge based on the alleged willful and malicious injury it suffered as a result of Adair's conduct.[20] On July 14, 2023, the United States Bankruptcy Court for the Middle District of Louisiana excepted the Judgment from general discharge under § 523(a)(6), holding that Adair *did* impose willful and malicious injury on Stutsman.[21] The court found Roy's testimony more credible than Adair's and found both "great financial harm" to Stutsman and intent by Adair to do that

---

[14] Trial Transcript, Rec. Doc. 3, p. 26, lines 18–20 (explaining that there was a "small touchup left"); Rec. Doc. 3, p. 32, line 10–p. 33, line 13; Rec. Doc. 1-1, p. 3. *See* Rec. Doc. 3, p. 59, line 8–p. 60, line 15 (Roy testifying about the incomplete touchups).

[15] Proposal & Authorization, Exhibit D8, p. 4; Trial Transcript, Rec. Doc. 3, p. 48, lines 21–25.

[16] Here, the bankruptcy court credited Roy's version of the facts. Rec. Doc. 1-1, p. 4; Trial Transcript, Rec. Doc. 3, p. 49, lines 1–3. Adair alleges that Stutsman was not entitled to the money until it finished the work and that Stutsman was refusing to complete the work. Trial Transcript, Rec. Doc. 3, p. 91, lines 3–18; Rec. Doc. 3, p. 114, lines 3–18.

[17] Trial Transcript, Rec. Doc. 3, p. 98, lines 3–9; p. 101, lines 12–17; p. 112, lines 14–18.

[18] Judgment, P2.

[19] Case no. 22-10249.

[20] Rec. Doc. 2-1.

[21] Rec. Doc. 1-1, p. 15.

harm.[22] Adair appealed to this Court on July 27, 2023.[23]

On appeal, Adair argues that the bankruptcy court's judgment should be reversed[24] on three grounds.[25] First and most importantly, Adair argues that the bankruptcy court erroneously placed the burden of proving an exception to discharge on Adair rather than on Stutsman. Second, Adair argues the bankruptcy court erred in holding that Adair converted the insurance proceeds by depositing the final check into his own account. Finally, Adair argues the bankruptcy court erred in "failing to consider the application of unclean hands to Stutsman's claims in equity."[26]

Of course, Stutsman argues that the bankruptcy court's judgment should be affirmed.[27] Specifically, Stutsman claims that the bankruptcy court was correct in holding that (1) Stutsman met its burden of proof for an exception to discharge the debt, and (2) the clean hands doctrine was subject to collateral estoppel.[28] Stutsman did not address Adair's claim about conversion of the insurance proceeds.[29]

## II.    LAW AND ANALYSIS

### A.  Standard of Review

United States District Courts have jurisdiction to hear appeals of judgments from bankruptcy courts.[30] For conclusions of law, "the bankruptcy court's decisions are

---

[22] *Id.* at 7–9.
[23] Rec. Doc. 1.
[24] *Id.* at p. 8.
[25] *Id.* at p. 17.
[26] *Id.*
[27] Rec. Doc. 7, p. 6.
[28] *Id.*
[29] *Id. See* Rec. Doc. 9, p. 5.
[30] 28 U.S.C. § 158(a).

reviewed de novo."[31] "The interpretation of Section 523(a)(6) is a question of law and is

reviewed de novo."[32] Matters of contract interpretation are also reviewed de novo.[33]

 The bankruptcy court's findings of fact are reviewed for clear error; in doing so, the

Court reviews "the record as a whole and not just the evidence supporting the finding."[34]

"The bankruptcy court's findings of fact may be reversed only if the reviewing court has

'the definite and firm conviction that a mistake has been made.'"[35] Mixed questions of fact

and law are also reviewed de novo.[36]

  1. <u>Discharge Exception for Willful and Malicious Injury under 11 U.S.C. §
523(a)(6)/Conversion of Insurance Proceeds</u>

 Adair argues the bankruptcy court erroneously placed the trial burden to prove an

exception to discharge on Adair instead of Stutsman.[37] As a result, Adair claims the

bankruptcy court erred in holding that Stutsman proved that "Adair <u>knowingly</u> breached

his contact with Stutsman and <u>intended</u> to cause injury to Stutsman."[38] More specifically,

the court purportedly erred in (a) finding the repairs complete, (b) finding that Adair

subjectively knew the repairs were complete, (c) "placing the burden on Adair to disprove

Stutsman's uncorroborated allegations by applying numerous negative inferences in an

attempt to establish Adair's subjective intent at the time he withheld payment from

Stutsman," and (d) rejecting or ignoring Adair's uncontested evidence and testimony.[39]

---

[31] *In re McClendon*, 765 F.3d 501, 504 (5th Cir. 2014) (quoting *In re TransTexas Gas Corp.*, 597 F.3d 298, 304 (5th Cir. 2010)).

[32] *In re Williams*, 337 F.3d 504, 508 (5th Cir. 2003).

[33] *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Care Flight Air Ambulance Serv., Inc.*, 18 F.3d 323, 325 (5th Cir. 1994) (citing *Travelers Ins. Co. v. Liljeberg Enterprises, Inc.*, 7 F.3d 1203, 1206 (5th Cir.1993)).

[34] *In re McClendon*, 765 F.3d 501, 504 (5th Cir. 2014) (quoting *In re TransTexas Gas Corp.*, 597 F.3d 298, 304 (5th Cir. 2010)).

[35] *In re Williams*, 337 F.3d 504, 508 (5th Cir. 2003) (citing *Cotten v. Deasy*, 2002 WL 31114061, at *2 (N.D. Tex. 2002)).

[36] *In re Nat'l Gypsum Co.*, 208 F.3d 498, 504 (5th Cir. 2000).

[37] Rec. Doc. 6, p. 17.

[38] *Id.* at 9 (emphasis in original).

[39] *Id.*

Stutsman counters that the bankruptcy court made proper credibility determinations; thus, it met its burden of proof for an exception to discharge the debt.[40]

The Court finds that the bankruptcy court applied the burden of proof appropriately. The bankruptcy court noted that, with facts in dispute, this case "largely turns on the relative credibility of the witnesses."[41] This Court must give "due regard . . . to the opportunity of the [bankruptcy] court to judge the credibility of the witnesses."[42] The bankruptcy court found Roy's testimony to be more credible than Adair's.[43] Specifically, the court found the construction work to be *nearly complete*, in line with Roy's testimony. This finding was supported by the inspection documentation indicating 100% completeness and the inspection being done by Freedom Mortgage, a non-party to this suit.[44] Adair's testimony was supported by text messages between himself and Roy and photographs of Stutsman's allegedly defective work, which were explained by his girlfriend, Megan Meyers.[45] Notably, one text message from Roy indicated that he could not finish the job and would decrease the amount of the final payment proportionately.[46] However, because both sides offered support beyond their testimony, and because Roy's support is from a non-party, this Court does not have the firm conviction that a mistake has been made regarding the bankruptcy court's factual findings, including that of the near completeness of the work. Thus, this Court does not find that the bankruptcy court

---

[40] Rec. Doc. 7, p. 6.

[41] Rec. Doc. 1-1, p. 6.

[42] *Matter of Perez*, 954 F.2d 1026, 1027 (5th Cir. 1992) (quoting Fed. R. Civ. P. 52(a)).

[43] Rec. Doc. 1-1, p. 6.

[44] *Id.* at p. 6–7. For example, the court found that Adair's "sole complaint prior to denying final payment was water damage in the master bedroom," which was caused by a leak from a preexisting rusted pipe separate from the contract with Stutsman. *Id.*

[45] Trial Transcript, Rec. Doc. 3, p. 146–158 (explaining Defense Exhibit 2); p. 61, lines 3–13 (Roy testifying about a text message that he sent Adair stating that he "will not be able to finish [Adair's] job"). For the pictures, *see* Rec Doc. 9, p. 9–15.

[46] Trial Transcript, Rec. Doc. 3, p. 61, lines 3–13.

inappropriately shifted the trial burden, nor are its factual determinations clearly erroneous.

Section 523(a)(6) provides that bankruptcy proceedings will not discharge a debt arising from "willful and malicious injury by the debtor to another entity or to the property of another entity."[47] The Fifth Circuit has stated that "willful" and "malicious" are synonymous and thus a unitary concept.[48] Section 523(a)(6) applies to "acts done with the actual intent to cause injury," not "acts, done intentionally, that cause injury."[49] The debtor must "intend 'the consequences of an act,' not simply 'the act itself.'"[50] The debtor must have acted with either an *objective substantial certainty* of injury or a *subjective motive* to cause injury.[51] An intent to injure "may be established by a showing that the debtor intentionally took action that necessarily caused, or was substantially certain to cause, the injury."[52] The creditor is "required to bear the burden of proof to establish by a preponderance of the evidence that his claim is nondischargeable."[53] Exceptions to discharge such as § 523(a)(6) "are construed strictly against the creditor and liberally in favor of the debtor."[54]

---

[47] 11 U.S.C. § 523(a)(6).
[48] *In re Keaty*, 397 F.3d 264, 270 (5th Cir. 2005) (citing *Matter of Miller*, 156 F.3d 598, 606 (5th Cir. 1998)).
[49] *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998).
[50] *Id.* at 61–62.
[51] *In re Williams*, 337 F.3d 504, 509 (5th Cir. 2003) (quoting *Miller v. J.D. Abrams, Inc.* (*In re Miller*), 156 F.3d 598, 603 (5th Cir. 1998)) (emphasis added).
[52] *State of Tex. By & Through Bd. of Regents of Univ. of Texas Sys. v. Walker*, 142 F.3d 813, 823 (5th Cir. 1998) (quoting *In re Delaney*, 97 F.3d 800, 802 (5th Cir.1996)).
[53] *In re McClendon*, 765 F.3d 501, 504 (5th Cir. 2014) (citing *Grogan v. Garner*, 498 U.S. 279, 286–87 (1991)).
[54] *In re Duncan*, 562 F.3d 688, 695 (5th Cir. 2009).

### a. Conversion of Insurance Proceeds

"Conversion of another's property may constitute a willful and malicious injury for purposes of prohibiting a debtor's discharge under § 523(a)(6)."[55] Adair argues the bankruptcy court erred in holding that Adair converted the insurance proceeds by depositing the final check.[56] While Adair raises this as a separate argument, its resolution is necessary to determine whether a willful and malicious injury occurred. Further, if Adair converted the insurance proceeds, this conduct could cause willful and malicious injury that would render the Judgment debt nondischargeable.

In Louisiana, "conversion" is defined as "an intentional act done in derogation of the plaintiff's possessory rights."[57] One commits conversion when one does "any wrongful act of dominion over the property of another which is inconsistent with the owner's rights."[58] Even if a party rightfully came to possess the thing, "the subsequent refusal to surrender the goods to one who is entitled to them may constitute conversion."[59] In addition to the act itself, conversion also requires "an *intent* to exercise dominion or control over the goods that is inconsistent with another's rights."[60] The "intent to commit wrongdoing is not an element of conversion."[61]

---

[55] *Matter of Scheuermann*, No. 92-1403, 1993 WL 35138, at *3 (E.D. La. Feb. 8, 1993), *aff'd sub nom. In re Scheuermann*, 8 F.3d 22 (5th Cir. 1993).

[56] Rec. Doc. 6, p. 17.

[57] *Aerotek, Inc. v. Revenue Cycle Mgmt., Inc.*, No. 08-4638, 2012 WL 860373, at *5 (E.D. La. Mar. 13, 2012) (citing *Kinchen v. Louie Dabdoub Sell Cars, Inc.*, 912 So.2d 715, 718 (La. App. 5th Cir. 2005)). *See Dual Drilling Co. v. Mills Equipment Investments, Inc.*, 721 So.2d 853, 857 (La.1998)

[58] *Silver v. Nelson*, 610 F. Supp. 505, 514 (E.D. La. 1985) (citing *Harper Oil Field Servs. v. Dugas*, 451 So.2d 96, 101 (La. App. 3d Cir. 1984)).

[59] *Jones v. Admin'rs of Tulane Educ. Fund*, 51 F.4th 101, 119 (5th Cir. 2022); *Kinchen v. Louie Dabdoub Sell Cars, Inc.*, 912 So. 2d 715, 718 (La. App. 5th Cir. 2005), *writ denied*, 925 So. 2d 544 (La. 2006).

[60] *Aerotek, Inc. v. Revenue Cycle Mgmt., Inc.*, No. 08-4638, 2012 WL 860373, at *5 (E.D. La. Mar. 13, 2012) (citing *Tubos de Acero de Mexico, S.A. v. Am. Int'l Inv. Corp.*, 292 F.3d 471, 479 (5th Cir. 2002)) (emphasis added).

[61] *Id.* at *6.

Here, Adair retained the money from the final check and refused to surrender the money to Stutsman. Adair also had the intent to keep and control the money, as he would only pay Stutsman when Stutsman completed the work to Adair's satisfaction.[62] Thus, the main issue is whether Stutsman had possessory rights in the final check.

The bankruptcy court ruled that, because Stutsman was a payee on the check, it had a property interest in the funds.[63] Adair claims being listed as a payee on a check does not give that person a property interest in the funds; rather, the property interest attaches when the check is honored by the bank, and the bank pays the payee the amount listed on the check.[64] Adair also argues the bankruptcy court erred in finding the check jointly payable to Adair and Stutsman because UCC § 3-110(d) provides that, when a check payable to multiple people is ambiguous about whether it is payable to the people alternatively or jointly, then the check is presumed payable to them alternatively; thus, the check here was payable to Adair and Stutsman alternatively, not jointly.[65]

A property interest is defined by state law.[66] As Adair points out, La. R.S. 10:3-110(d) provides that "[i]f an instrument payable to two or more persons is ambiguous as to whether it is payable to the persons alternatively, the instrument is payable to the persons *alternatively*."[67] And, "[i]f an instrument is payable to two or more persons *alternatively*, it is payable to any of them and may be negotiated, discharged, or enforced by *any* or all of them *in possession* of the instrument."[68] However, "[i]f an instrument is

---

[62] Trial Transcript, Rec. Doc. 3, p. 90, line 25–p. 92, line 5; p. 114, lines 15–18. *But see id.* at p. 49, lines 1–3 (Roy testifying that Adair told him that Adair did not ever intend to pay Roy).
[63] Rec. Doc. 1-1, p. 10.
[64] Rec. Doc. 6, p. 34 (citing *In re Contractor Tech., Ltd.*, 343 B.R. 573 (Bankr. S.D. Tex. 2006), *subsequently aff'd sub nom. In Matter of Contractor Tech. Ltd.*, 229 F. App'x 294 (5th Cir. 2007)).
[65] *Id.*
[66] *Barnhill v. Johnson*, 503 U.S. 393, 398 (1992) (citing U.C.C. §§ 3-104(1), (2)(b)).
[67] La. R.S. 10:3-110(d) (emphasis added).
[68] *Id.* (emphasis added).

payable to two or more persons jointly, it is payable to all of them and may be negotiated, discharged, or enforced *only* by all of them."[69] Comment 4 indicates that the "ambiguous" rule applies to cases where it is unclear whether "an instrument is payable to multiple payees alternatively. In the case of ambiguity[,] persons dealing with the instrument should be able to rely on the indorsement of a single payee. For example, an instrument payable to X and/or Y is treated like an instrument payable to X or Y."[70]

Here, because there was no conjunction between Adair's and Stutsman's names, it is ambiguous whether Freedom Mortgage intended to pay both of them or either of them. Because of this ambiguity, the check is treated as being payable to either of them. Adair, being in possession of the check, had the right to be paid the proceeds *from the bank*. However, this does not end the inquiry regarding Stutsman's purported property interest in the proceeds.

The comment to La. R.S. 10:3-420, which discusses the conversion of instruments, provides some guidance.[71] A check payee does not have any property interest in the check until "delivery."[72] "The payee receives delivery when the check comes into the payee's possession, as for example when it is put into the payee's mailbox. . . . If a check is payable to more than one payee, delivery to one of the payees is deemed to be delivery to all of the payees."[73] When the check was delivered to Adair and came into his possession, that delivery to Adair gave him a property interest in the check. But, delivery

---

[69] *Id.*

[70] *Id.* cmt. 4.

[71] La. R.S. 10:3-420. Section (b)(ii) provides that "[a]n action for conversion of an instrument may not be brought by . . . a payee . . . who did not receive delivery of the instrument either directly or through delivery to [a] co-payee . . . ." La. R.S. 10:3-420(b)(ii).

[72] La. R.S. 10:3-420 cmt. ("Until delivery, the payee does not have any interest in the check. The payee never became the holder of the check nor a person entitled to enforce the check.").

[73] *Id.*

to Adair also effectuated delivery to his co-payee, Stutsman, giving Stutsman an interest in the proceeds as well. Because Stutsman had an interest in the check, Adair's retention of the proceeds and refusal to surrender them to Stutsman constituted conversion.

### b. Breach of Contract

In addition to conversion, injuries due to a "knowing breach of contract may be nondischargeable under Section 523(a)(6) . . . [as long as there is] explicit evidence that a debtor's breach was intended or substantially certain to cause the injury to the creditor."[74] "[T]he dischargeability of contractual debts under Section 523(a)(6) depends upon the knowledge and intent of the debtor at the time of the breach."[75] In *State of Tex. v. Walker*, the debtor, a professor at the University of Texas, intentionally kept professional fees instead of remitting them to the University, as required by his employment contract.[76] The Fifth Circuit found that the debtor was not aware of such contractual obligations to the University and, thus, could not satisfy the "knowing" requirement for a willful and malicious injury.[77] However, the Fifth Circuit stated that, "[i]f a factfinder were to decide that [the debtor] knew of his obligations under the . . . contract . . . , then it might also find that [the debtor] knowingly retained his professional fees in violation of the [contract], an act which he knew would necessarily cause the University's injury," which could lead to a finding of willful and malicious injury.[78] "Such factual issues must be submitted to a trier of fact in order to determine if [the debtor's]

---

[74] *In re Williams*, 337 F.3d 504, 511 (5th Cir. 2003) (citing *State of Tex. By & Through Bd. of Regents of Univ. of Texas Sys. v. Walker*, 142 F.3d 813, 824 (5th Cir. 1998)).
[75] *In re Williams*, 337 F.3d 504, 510 (5th Cir. 2003)
[76] *State of Tex. By & Through Bd. of Regents of Univ. of Texas Sys. v. Walker*, 142 F.3d 813, 815 (5th Cir. 1998).
[77] *Id.* at 824.
[78] *Id.*

debt was nondischargeable under § 523(a)(6)."[79] In *Walker*, because a factfinder did not determine whether the professor knew of his obligations under the contract, the issue could not be determined on summary judgment.[80] Thus, in addition to having either an intention to injure or knowledge of the substantial certainty of harm, the debtor must have knowledge at the time of the breach of both his contractual obligation and his breach of that obligation.

Here, the bankruptcy court concluded that Adair knew his contractual obligation to Stutsman—that he would owe Stutsman money under the contract for the completed construction work and that he had previously always paid Stutsman as he received the checks from Freedom Mortgage. Adair testified that, upon the receipt of a check, he would pay Stutsman eventually when the work was completed,[81] and he signed the contract directly beneath the term reciting that the final payment was due upon completion.[82] Thus, under the bankruptcy court's factual finding that the work was 99–100% complete at the time the last check was issued, and given Adair's knowledge of the inspection report indicating 100% completeness,[83] Adair knew that he was breaching his construction contract with Stutsman by failing to pay Stutsman for the completed work. He also knew he was breaking the payment arrangement he had previously adhered to by failing to pass on the funds to Stutsman upon receipt.

---

[79] *Id.*

[80] *Id.*

[81] Trial Transcript, Rec. Doc. 3, p. 90, line 25–p. 92, line 5; p. 114, lines 15–18. *But see id.* at p. 49, lines 1–3 (Roy testifying that Adair told him that Adair did not ever intend to pay Roy).

[82] Rec. Doc. 2-2, p. 180, 212.

[83] Trial Transcript, Rec. Doc. 3, p. 99, lines 8–11; p. 101, lines 5–6. Adair's argument that the inspector falsely marked 100% completion indicates that Adair knew the inspection report designated the work as 100% complete.

Adair arguably lacked the subjective intent to harm Stutsman.  He testified that he did not have "any feelings towards Stutsman at all,"[84] and he merely wanted to keep the money for himself, allegedly to correct Stutsman's poor workmanship.[85] This intention to keep the money was an act, done intentionally, that caused injury, not necessarily an act done with the subjective intent to cause injury to Stutsman.

Nevertheless, Adair's failure to render final payment to Stutsman, thus breaching the contract, was substantially certain to injure Stutsman. The bankruptcy court concluded that any layperson with everyday common sense would know that if a company does not get paid for its time, effort, and materials, especially a small "mom-and-a-pop's organization" like Stutsman,[86] it would suffer financial harm. Roy testified as to the damages that Stutsman sustained, specifically owing $50,000 to supply companies for Adair's project, and Roy also testified about personally going into debt from his neck surgery due to the lack of payment from Adair.[87]  The bankruptcy court found that (1) Stutsman suffered financial harm due to Adair's decision to keep the check, and (2) Adair "intended to keep the check from Stutsman and use it for himself."[88] Based on these fnidings, the bankruptcy court determined that Adair "knowingly breached his clear contractual obligation to pay Stutsman when he kept the final check" and that "any reasonable person dealing with Stutsman, a small operation under any conceivable standard, would know that keeping the final check would cause great financial harm."[89]

---

[84] Trial Transcript, Rec. Doc. 3, p. 131, lines 2–5.
[85] Trial Transcript, Rec. Doc. 3, p. 90, line 25–p. 91, line 18; p. 112, lines 1–5 (the check "went into the home to repair the, repairs that Stutsman did and for the work that they didn't do").
[86] Trial Transcript, Rec. Doc. 3, p. 14, lines 4–5.
[87] Trial Transcript, Rec. Doc. 3, p. 55, lines 1–19.
[88] Rec. Doc. 1-1, pp. 7-11.
[89] *Id.* at p. 14.

In reaching this finding, the bankruptcy court applied the reasoning and analysis by the Fifth Circuit in *Walker*, where the Fifth Circuit took the commonsense approach that, if the debtor knows his obligations under the contract and knowingly retains money in violation of that contract, then it necessarily follows that the debtor knows this retention would cause injury to the creditor.[90] The Court finds no error in the bankruptcy court's application of Fifth Circuit jurisprudence to the facts it found at trial.  Because all the factors under § 523(a)(6) are satisfied, the Court affirms the bankruptcy court's determination that Adair's actions were willful and malicious; therefore, the Judgment debt is nondischargeable for breach of contract as well as for conversion.

2.  <u>The Clean Hands Doctrine and Collateral Estoppel</u>

Adair claims Stutsman's hands are unclean because it "did not possess the proper licensing at the time it held itself out to Adair as a licensed residential contractor and contracted with Adair for a job in excess of $75,000."[91] The Licensing Board indeed found that Stutsman did not possess the proper licensing for this job, as the bankruptcy court recognized.[92]

Courts apply the clean hands doctrine "only where some unconscionable act of one coming for relief has immediate and necessary relation to the equity that he seeks."[93] Under this doctrine, "a federal court should not, in an ordinary case, lend its judicial power to a plaintiff who seeks to invoke that power for the purpose of consummating a transaction in clear violation of law."[94]

---

[90] *State of Tex. By & Through Bd. of Regents of Univ. of Texas Sys. v. Walker*, 142 F.3d 813, 824 (5th Cir. 1998).
[91] Rec. Doc. 6, p. 39.
[92] Rec. Doc. 2-3, p. 56, lines 4–7.
[93] *Keystone Driller Co. v. General Excavator Co.*, 290 U.S. 240, 245 (1933).
[94] *Johnson v. Yellow Cab Transit Co.*, 321 U.S. 383, 387 (1944).

However, "even though 'He who comes into equity must come with clean hands,'" equity 'does not demand that its suitors shall have led blameless lives.'"[95] The maxim of requiring clean hands "does not mean that courts must always permit a defendant wrongdoer to retain the profits of his wrongdoing merely because the plaintiff himself is possibly guilty of transgressing the law in the transactions involved."[96] The doctrine is "not applied by way of punishment for an unclean litigant but 'upon considerations that make for the advancement of right and justice.'"[97] "It is not a rigid formula which 'trammels the free and just exercise of discretion.'"[98] Thus, a "court may employ the doctrine to deny . . . relief 'where the party applying for such relief is guilty of conduct involving fraud, deceit, unconscionability, or bad faith *related to the matter at issue to the detriment of the other party*.'"[99]

Adair contends the bankruptcy court gave short shrift to his "unclean hands" defense, finding that it was *res judicata* based on the state court default judgment. The bankruptcy court specifically held as follows:

> Debtor's claim that Stutsman was unlicensed arose out of the same contract that was the subject matter of the state court litigation. Debtor either did, unsuccessfully, or should have urged that defense in state court. Thus, under Louisiana Revised Statute 13:4231(1) the licensing issue was extinguished and merged into the Judgment. To allow the debtor now to use the licensing argument to deprive Stutsman of pursuing this lawsuit would turn *res judicata* principles on its ear.
>
> And further, the Debtor has now conceded in this Court that the entirety of Stutsman Judgment, Stutsman's Judgment is valid.    Allegations of

---

[95] *Veritext Corp. v. Bonin*, No. 16-13903, 2021 WL 1313409, at *5 (E.D. La. Apr. 8, 2021) (quoting *Loughran v. Loughran*, 292 U.S. 216 (1934)).

[96] *Johnson v. Yellow Cab Transit Co.*, 321 U.S. 383, 387 (1944).

[97] *Johnson v. Yellow Cab Transit Co.*, 321 U.S. 383, 387 (1944) (quoting *Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S. 240, 245 (1933)).

[98] *Johnson v. Yellow Cab Transit Co.*, 321 U.S. 383, 387 (1944) (quoting *Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S. 240, 245–46 (1933)).

[99] *Veritext Corp. v. Bonin*, No. 16-13903, 2021 WL 1313409, at *5 (E.D. La. Apr. 8, 2021) (quoting *Performance Unlimited v. Questar Publishers*, 52 F.3d 1373, 1383 (6th Cir. 1995) (emphasis added)).

uncleans, unclean hands will not block this lawsuit at the summary judgment stage or be used at trial to reduce the amount of Stutsman's debt memorialized by the state court Judgment. Thus, summary judgment is denied to the extent the Debtor is attempting to dismiss this lawsuit for Stutsman's unclean hands.[100]

"The Supreme Court has explicitly stated that collateral estoppel (or issue preclusion) principles apply in bankruptcy dischargeability proceedings" under § 523(a).[101] "Parties may invoke collateral estoppel in certain circumstances to bar relitigation of issues relevant to dischargeability, although the bankruptcy court retains exclusive jurisdiction to ultimately determine the dischargeability of the debt."[102] "A bankruptcy court's decision to give preclusive effect to a state court judgment is a question of law that we review *de novo*."[103]

"In deciding the preclusive effect of a state court judgment in federal court, we are guided by the full faith and credit statute;" thus, state court judgments shall have the same full faith and credit in federal courts as they do in state court.[104] The state Judgment in this case was rendered in a Louisiana court; thus, Louisiana rules of issue preclusion apply.[105] Louisiana law provides that "[a] judgment in favor of either the plaintiff or the defendant is conclusive, in any subsequent action between them, with respect to any issue actually litigated and determined if its determination was essential to that

---

[100] Rec. Doc. 2-3, Transcript of Oral Ruling on Cross-Motions for Summary Judgment, dated March 3, 2023, p. 10, lines 8-23.
[101] *Matter of Schwager*, 121 F.3d 177, 181 (5th Cir. 1997) (citing *Grogan v. Garner*, 498 U.S. 279, 284 n. 11, (1991)).
[102] *Id.* at 1201 (citing *Grogan v. Garner*, 498 U.S. 279, 284 n. 11 (1991)).
[103] *Id.* (citing *Boyce v. Greenway (In re Greenway)*, 71 F.3d 1177, 1180–81 (5th Cir.), *cert. denied*, 517 U.S. 1244 (1996); *Sanders v. City of Brady (In re Brady, TX Mun. Gas Corp.)*, 936 F.2d 212, 217 (5th Cir.), *cert. denied*, 502 U.S. 1013 (1991)) (emphasis in original).
[104] *Matter of Gober*, 100 F.3d 1195, 1201 (5th Cir. 1996) (citing 28 U.S.C. § 1738).
[105] *Marrese v. Am. Acad. of Orthopaedic Surgeons*, 470 U.S. 373, 380 (1985) (28 U.S.C. § 1738 "directs a federal court to refer to the preclusion law of the State in which judgment was rendered"; the federal court must "accept the rules chosen by the State from which the judgment is taken").

judgment."[106] Thus, issue preclusion both under Louisiana state law and under the Fifth Circuit requires the following: "(1) the parties must be identical; (2) the issue to be precluded must be identical to that involved in the prior action; (3) the issue must have been actually litigated; and (4) the determination of the issue in the prior action must have been necessary to the resulting judgment."[107] "The requirement that an issue be 'actually litigated' for collateral estoppel purposes simply requires that the issue is raised, contested by the parties, submitted for determination by the court, and determined."[108]

Under the first element, it is undisputed that the Parties herein are identical as in state court and before the bankruptcy court. However, whether Stutsman was licensed was never litigated or even raised in state court because the Judgment was a default judgment; Adair never appeared in state court.[109] But that does not end the inquiry.

The bankruptcy court acknowledged that the lack of a requisite license is "unquestionably a defense to a construction contract under Louisiana law;"[110] however, the court continued: "it is clear from Debtor's complaint to the Licensing Board that he knew during the first week of the state court case, at the latest, that Stutsman lacked the license for jobs over 75,000," but "he either chose not to raise it in his answer or did raise it but for whatever reason failed to fully prosecute this defense."[111] Critically, the court explained "[f]or present purposes, it doesn't matter whether it was raised or not. It clearly could have and likely should have been raised."[112] Rejecting Adair's attempt to raise this

---

[106] La. R.S. 13:4231(3).
[107] *In re Keaty*, 397 F.3d 264, 270–71 (5th Cir. 2005).
[108] *In re Keaty*, 397 F.3d 264, 272 (5th Cir. 2005).
[109] Rec. Doc. 2-1, p. 21.
[110] *Id.* at p. 9, lines 8-10 (citing *Trade-Winds Environmental Restoration, Inc. v. St. Tammany Park, L.L.C.*, No. 06-593, 2007 WL 1191896, at *3 (E.D. La. Apr. 20, 2007)).
[111] *Id.* at p. 9, lines 14-9.
[112] *Id.* at p. 9, lines 19-21.

defense in the dischargeability case, the court relied on Louisiana Revised Statute 13:4231, which provides:

> Except as otherwise provided by law, a valid and final judgment is conclusive between the same parties, except on appeal or other direct review, to the following extent:
>
> > (1) If the judgment is in favor of the plaintiff, all causes of action existing at the time of final judgment arising out of the transaction or occurrence that is the subject matter of the litigation are extinguished and merged into the judgment.

On appeal, Adair claims "the bankruptcy court committed legal error in finding that the defense of unclean hands was barred by collateral estoppel."[113] Adair then criticizes the bankruptcy court for applying *res judicata*, arguing that the appropriate standard to be applied is collateral estoppel.[114]   Adair acknowledges the Fifth Circuit requires a bankruptcy court to apply collateral estoppel rules of the forum state when considering the preclusive effect of a state court judgment,[115] then points out that "collateral estoppel is not recognized under Louisiana law."[116]  Adair further argues: "Because Louisiana law does not recognize collateral estoppel, much less give such preclusive effect to default judgments, the issue of unclean hands was properly before the bankruptcy court."[117]

Adair's arguments fall short. First, the bankruptcy court correctly applied the collateral estoppel principles of the forum state – Louisiana – as it recognizes the preclusive doctrine of *res judicata*.  Second, a default judgment in the state court *can* have a preclusive effect on later litigation. Indeed, the record reflects that Adair conceded

---

[113] Rec. Doc. 6, p. 36.
[114] *Id.* at p. 37.
[115] *Id.* (citing *Matter of Gober*, 100 F.3d 1195, 1201 (5th Cir.1996)).
[116] *Id.* (citing *Alonzo v. State ex rel. Dep't of Nat. Res.*, 2002-0527 (La. App. 4 Cir. 9/8/04), 884 So. 2d 634 (citing *Welch v. Crown Zellerback Corp.*, 359 So. 2d 154, 156 (La. 1978) ("Collateral estoppel is a doctrine of issue preclusion alien to Louisiana law")).
[117] *Id.* at p. 38.

before the bankruptcy judge that the state court Judgment was valid: "The Debtor has now conceded in this Court that the entirety of Stutsman Judgment, Stutsman's Judgment is valid."[118] Finally, a wealth of applicable, binding, and persuasive jurisprudence forecloses this claim.

The Fifth Circuit held in *Browning v. Navarro* that a bankruptcy court may consider challenges to judgments of other courts only "on the ground that the purported judgment is not a judgment because of want of jurisdiction of the court which rendered it over the persons of the parties or the subject matter of the suit, or because it was procured by fraud of a party."[119]  The bankruptcy court's review of these issues is limited, however, by the rules of *res judicata*, and the bankruptcy court may not reexamine these issues if already determined by a prior judgment.[120]  The Fifth Circuit has also held that a district court violates the letter of the *Rooker-Feldman* doctrine by sitting in appellate review of a state court judgment.[121] While a state court judgment may be immediately appealable, it is not appealable, immediately or otherwise, to the federal courts.[122]

In an analogous case, the Eastern District of Texas held in *In re Hensley* that "collateral estoppel applies in the bankruptcy context, including in bankruptcy appeals to the United States District Court on the issue of nondischargeability and the effect of collateral estoppel on a prior state court judgment."[123]  The *Hensley* court explained:

---

[118] Rec. Doc. 2-3, Transcript of Oral Ruling on Cross-Motions for Summary Judgment, dated March 3, 2023, p. 10, lines 16-18.
[119] 826 F.2d 335, 342 (5th Cir. 1987) (quoting *Heiser v. Woodruff*, 327 U.S. 726 at 736 (1946)).
[120] *Id.* at 346 (citing *Heiser*, 327 U.S. at 736).
[121] *Matter of Reitnauer*, 152 F.3d 341, 344 (5th Cir. 1998).  See id. at 343, n.7 ("The doctrine derives its name from two Supreme Court cases, *Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 415, 44 S.Ct. 149, 68 L.Ed. 362 (1923), holding that the jurisdiction of the federal district courts is strictly original, and *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 476 & 482, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983), holding that federal district courts do not have the authority to review final state court judgments.").
[122] *Id.*
[123] 551 B.R. 792, 799 (E.D. Tex. 2015)

Collateral estoppel, or issue preclusion, "means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." *Schiro v. Farley*, 510 U.S. 222, 232, 114 S.Ct. 783, 127 L.Ed.2d 47 (1994) (internal quotations omitted). "Under collateral estoppel, once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation." *Montana v. United States*, 440 U.S. 147, 153, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979) (citing *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 n. 5, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979)). Where the factual issues for the creditor's theory of nondischargeability have been actually litigated in a prior proceeding, neither the creditor nor the debtor may relitigate those grounds. *RecoverEdge L.P. v. Pentecost*, 44 F.3d 1284, 1294 (5th Cir.1995).[124]

The court noted that a "federal Court is not the proper forum or reviewing the application or interpretation of a state law by a state court."[125]   Further, "the *Rooker/Feldman* doctrine requires that, '[a]bsent specific law otherwise providing, [*Rooker/Feldman*] directs that federal district courts lack jurisdiction to entertain collateral attacks on state court judgments.'"[126]   Where the state court erred in applying state law, its "'judgment is not void, it is to be reviewed and corrected by the appropriate state appellate court.'"[127]   And, "'[l]ike the bankruptcy court, [the district court] lack[s] the authority to review the decision of the [state] court.'"[128]

In *In re Nazu, Inc.*, the Southern District of Texas considered an appeal from the bankruptcy court decision below.[129]   A default judgment *nunc pro tunc* had been rendered

---

[124] *Id.* at 799-800 (quoting *Whitaker v. Moroney Farms Homeowners' Ass'n,* No. 4–14–CV–700, 2015 WL 3610306, at *3 (E.D.Tex. June 5, 2015) (appeal of bankruptcy adversary action)).

[125] *Id.* at 803.

[126] *Id.* (quoting *Liedtke v. State Bar of Texas*, 18 F.3d 315, 317 (5th Cir.1994) (citing *Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923) and *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983)); *see also In re Rabalais*, 496 Fed.Appx. 498, 500 (5th Cir.2012) (finding that "bankruptcy courts may not sit as appellate courts and revisit the merits of state court decisions," citing *Rooker* and *Feldman*)).

[127] *Id.* (quoting *Liedtke*, 18 F.3d at 317).

[128] *Id.* (quoting *In re Rabalais*, 496 Fed.Appx. at 500).

[129] 350 B.R. 304 (S.D. Tex. 2006).

against the debtor in state court.  On appeal from the bankruptcy court's decision, the

debtor argued that "[t]he Judgment and the default judgment are void based solely upon

the failure to serve the proper party;" thus, the court should reject the creditor's claim.[130]

The court characterized the debtor's requested relief as asking the court "to  'review,

modify, or nullify a final order of a state court' in violation of the *Rooker–Feldman*

doctrine."[131]  The court rejected this argument, holding:

> Despite the Debtor's contentions otherwise, the Default Judgment *Nunc Pro Tunc* is not void due to defective service of citation. Because the Default Judgment *Nunc Pro Tunc* is a valid judgment, and because the Debtor sought no relief from the Default Judgment *Nunc Pro Tunc* in Texas state courts, this Court must give the Default Judgment *Nunc Pro Tunc* the same preclusive effect a Texas state court would give it and allow [the creditor's] Claim based on the Default Judgment *Nunc Pro Tunc*.[132]

This principle holds true in bankruptcy cases outside the Fifth Circuit.  In *In re*

*Harper*, a Chapter 7 debtor could not, in judgment creditor's nondischargeability

proceeding before the bankruptcy court, collaterally attack the state court judgment that

had been entered against him, even though the debtor may have had some grounds to

attempt to set aside the judgment in state court.[133]  In *In re Gibson*, the court held that a

Pennsylvania default judgment had *res judicata* effect and was, therefore, "as conclusive

as one rendered on a verdict after litigation insofar as a defaulting defendant is

concerned."[134]

---

[130] *Id.* at 313 (internal quotation marks omitted).

[131] *Id.* (quoting *Kimball v. Florida Bar*, 632 F.2d 1283, 1284 (5th Cir.1980) (quoting *Lampkin–Asam v. Supreme Court of Florida*, 601 F.2d 760 (5th Cir.1979)); *see also Liedtke*, 18 F.3d at 317 (quoting *Kimball*, 632 F.2d at 1284); *Reitnauer v. Texas Exotic Feline Found.* (*In re Reitnauer*), 152 F.3d 341, 344 (5th Cir.1998) (finding "that the district court violated the letter of the *Rooker–Feldman* doctrine by sitting in appellate review of the state court judgment")).

[132] *Id.* at 313-314.

[133] 378 B.R. 836 (Bankr. E.D. Ark. 2007).

[134] 249 B.R. 645, 652 (Bankr. E.D. Pa. 2000) (citing *Zimmer v. Zimmer*, 457 Pa. 488, 491, 326 A.2d 318, 320 (1974); *Devlin v. Piechoski*, 374 Pa. 639, 643, 99 A.2d 346, 347 (1953); *Exler v. Wickes Bros.*, 263 Pa. 150, 154, 106 A. 233, 234 (1919); and *Stradley v. Bath Portland Cement Co.*, 228 Pa. 108, 117, 77 A. 242, 245 (1910)).

Applying the foregoing jurisprudence to the present case, the Court rejects Adair's contention that the bankruptcy court should have considered the merits of his clean hands affirmative defense.  Adair acknowledged the validity of the State Judgment.  He has not explained why his clean hands defense was not presented in state court, or why he failed to appeal or seek reconsideration of the State Judgment through procedures available to him in Louisiana courts.  Adair has failed to present the Court with binding authority to establish that Stutsman's conduct perpetrated a fraud on the state court, thus making it subject to review by the bankruptcy court.

Accordingly, the Court affirms the bankruptcy's courts determination that the validity of the State Judgment is *res judicata* and precludes the clean hands doctrine affirmative defense in federal courts.

## III.    CONCLUSION

For the reasons set forth above, the Order of the Bankruptcy Court is AFFIRMED, and this appeal is dismissed with prejudice.

**IT IS SO ORDERED.**

Signed in Baton Rouge, Louisiana on <u>March 27, 2024</u>.

**CHIEF JUDGE SHELLY D. DICK**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**